UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                          CASE NO: 6:16-cr-3-Orl-28DAB

HAMID MOHAMED AHMED ALI
REHAIF

ORDER

A grand jury returned a two-count indictment charging Defendant Hamid Mohamed Ahmed Ali Rehaif—a citizen of the United Arab Emirates who was in the United States on a student visa—with the offenses of Illegal Alien in Possession of a Firearm and Illegal Alien in Possession of Ammunition. (Doc. 13).[1]  Defendant's Motion to Suppress (Doc. 29) seeks to exclude from evidence Defendant's responses to questions asked by federal law enforcement officers and derivative evidence seized by the officers.  Deciding the merits of the motion requires that I determine whether a reasonable innocent person in Defendant's position would believe that he was free to terminate the questioning and leave.  Taking into account the totality of the circumstances in this case, I answer that question in the affirmative.  Therefore, Defendant's Motion to Suppress (Doc. 29) must be denied.

I.

On December 8, 2015, at about 10:00 a.m., the Melbourne Police Department received a call from the manager of the nearby Hilton Rialto Hotel.  The manager reported that Defendant's behavior was suspicious and then provided details supporting that conclusion.  Defendant had been a guest for over 50 days, checking in every evening and

---

[1] Both counts allege violation of 18 U.S.C. § 922(g)(5)(A).

checking out the next day. He always requested a room on the eighth floor with a view of the Melbourne International Airport which is nearby. Defendant paid for the room with cash, and by the time of the manager's call to the police he had paid a total of over $11,000. The manager also reported that Defendant occasionally gave hotel employees rounds of ammunition as souvenirs. Later that day, two uniformed Melbourne Police officers— Sergeant Cyril Hopping and Officer Kevin Palmeri—responded to the hotel. After the police conducted a preliminary investigation, Sergeant Hopping contacted the office of the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE").

At approximately 2:00 p.m., several federal agents arrived, including ICE Agents Jesus Martin and Jacqueline Acosta along with FBI Agent Tom Slone. After speaking with Sergeant Hopping and the hotel manager, the agents returned to the hotel parking lot to retrieve gear. While in the parking lot, the agents received notice that Defendant had exited the elevator and entered the hotel lobby. Upon seeing Defendant, Sergeant Hopping approached Defendant and asked if they could talk. Defendant agreed, and Sergeant Hopping asked Defendant to take a seat on a couch in the lobby. Within a few minutes, the federal agents reentered the lobby and Sergeant Hopping stepped away.

During the time Sergeant Hopping was with Defendant, he did not make any demands of Defendant or give him instructions. At no time did Sergeant Hopping touch Defendant. And, although Sergeant Hopping's sidearm was visible, he never touched it or made any reference to it. Sergeant Hopping did not tell Defendant that he was under arrest or that he could not leave. While in Sergeant Hopping's presence, Defendant remained calm and polite.

When the federal agents reentered the lobby, Defendant was still seated on the couch. ICE Agent Martin was the first to approach Defendant. He asked Defendant if he could perform a pat down to check for weapons, explaining that it was a safety precaution. Defendant agreed, and the two men stepped around a corner in the lobby. Agent Martin conducted the pat down, which revealed that Defendant was not armed. Defendant asked Agent Martin what was going on, and Agent Martin told him that another agent would explain.

As Agent Martin was conducting the pat down, Agent Slone approached Defendant and asked if he could speak with him. Defendant agreed, and Agent Slone asked if there was anyone in Defendant's room. Defendant told Agent Slone that no one was in his room and agreed that Agent Slone could check. When Agent Slone asked Defendant for a key, Defendant said the door was open. The door to Defendant's room was indeed open, and after a quick search, Agents Slone and Acosta and Sergeant Hopping confirmed that the room was unoccupied and returned to the lobby. While Agents Acosta and Slone were checking Defendant's room, Agent Martin asked Defendant to accompany him to a conference room where private conversation would be possible. When Defendant agreed, Agent Martin escorted Defendant to a conference room off the lobby about twenty feet away. When Agents Acosta and Slone entered the conference room and introduced themselves, Agent Martin left.

There were eight chairs at a table in the conference room: Defendant sat at the head of the table, closest to the door, and Agents Acosta and Slone took the seats next to him. Officer Palmeri, who was responsible for writing a report for the Melbourne Police

3

Department, also remained in the room—sitting in a chair against the wall on which the only door was located.

Throughout the interview, Defendant answered questions asked by the agents. At first the questions were about Defendant's visa status. Defendant admitted that he had been a student at Florida Institute of Technology but was no longer enrolled. He then stated that he was attending classes at Kaiser University, but he later admitted that he was not enrolled at that school either and that his student visa had lapsed. He stated that he was in violation of his immigration status by not being in school. The conversation then turned to firearms. Defendant admitted that while in Florida he purchased three firearms and gave one of those firearms to his girlfriend. He also admitted that he used firearms at two local firing ranges. Defendant explained that the ranges initially denied him access because he could not establish that he was a legal resident. To cure this problem, Defendant applied for and received a Florida hunting license that satisfied the objection of the ranges. He also admitted that he currently had possession of ammunition that he kept in a black bag in his hotel room. Defendant then orally gave the agents permission to again enter his room, where they found the ammunition as Defendant described. Toward the end of the interview, Defendant mentioned that he kept personal belongings at a local storage facility. He then gave written consent for the agents to search that facility as well as his cell phone.

The interview with Agents Acosta and Slone lasted between one-and-a-half and two-and-a-half hours. During this time, Defendant remained calm; he did not make any requests for food or water or to use the bathroom. He made no requests to suspend or terminate the interview. There is no evidence that the agents or Officer Palmeri made

threats or intimidated Defendant.  Although Officer Palmeri was in uniform and visibly armed, the federal agents did not display the weapons or handcuffs in their possession. At all times during the interview, Defendant was "polite" and "a gentleman."

II

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court put in place protective measures to ensure that "custodial interrogation cannot occur before a suspect is warned of his or her rights against self-incrimination." United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007) (citing Miranda, 384 U.S. at 445).  Under Miranda, the statement of a defendant who has not been warned cannot be used at trial if the statement was the product of interrogation conducted while the defendant was in custody.  Miranda, 384 U.S. at 444.  Entitlement to warnings against self-incrimination "attaches when custodial interrogation begins." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).  But, entitlement to the warnings does not attach at all if the statements of the defendant were made before he was in custody.  United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).  In this case, Defendant was not given Miranda warnings, and the statements he seeks to suppress were made pursuant to interrogation.  The only question is whether he was in custody at the time of the interrogation.

A defendant may be in custody for Miranda purposes even if he has not been formally arrested.  Street, 472 F.3d at 1309.  But it is not enough that "a reasonable person in the defendant's position may feel constrained not to leave . . . and thus may be deemed to have been 'seized' by law enforcement." United States v. Luna-Encinas, 603 F.3d 876,

5

881 (11th Cir. 2010). Instead, a defendant is in custody for Fifth Amendment purposes if there is "restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation omitted). Whether a defendant is in custody "'depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" Brown, 441 F.3d at 1347 (quoting United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001)). As stated, the test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." Id. (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)). Importantly, the test requires that the reasonable person from whose perspective the question of custody is assessed also be innocent. Id.

Many factors may be considered in making the determination of whether a defendant is in custody for Miranda purposes. Among these factors are "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," Street, 472 F.3d at 1309 (internal quotation omitted), "as well as the location and length of the detention," Luna-Encinas, 603 F.3d at 881. Other factors are physical restraint of the suspect, actual or threatened; and whether a suspect is allowed food or drink, and has access to a bathroom. See Brown, 441 F.3d at 1348–49. In assessing the totality of circumstances, "[n]o particular fact in the 'custody' analysis is outcome determinative—[the court] simply weigh[s] the totality of the circumstances." Id. at 1349.

6

III.

Although stating the test for custody is easy, the application of that test is often difficult.  In this case, Defendant did not testify or otherwise offer evidence during the hearing on his motion to suppress.  The Government, on the other hand, relied on the testimony of three federal law enforcement officers—Agents Acosta, Martin, and Slone—and Melbourne Police Sergeant Hopping.  The Government also presented documents generated by law enforcement personnel.  The testimony and evidence presented by the Government is consistent, and I find it credible.

By all accounts, interaction between the law enforcement officers and Defendant was courteous and respectful from the initial encounter by Sergeant Hopping until Defendant signed the waiver allowing a search of his storage space.  Sergeant Hopping asked Defendant whether the investigators could speak with him, and only after Defendant agreed did Sergeant Hopping ask Defendant to have a seat on a couch located in the public lobby of the hotel to wait for the return of the federal agents.  The benign tone of the encounter continued when Agent Martin approached Defendant, requested permission to pat Defendant down, and waited for an affirmative response before doing so.  Defendant agreed that Agent Slone could enter his room, and when Agent Slone asked for a key Defendant volunteered that the door was open.  There is no evidence that any of the investigators raised their voices or made threatening statements to Defendant.  In fact, there is no evidence that any of the officers ever ordered or instructed Defendant to say or do anything.

Nor were there actions by the investigators that could be described as threatening.  There were at least four federal agents at the hotel, but only Agents Martin, Acosta, and

Slone had contact with Defendant, and Agent Martin's contact was brief.   Sergeant Hopping and Officer Palmeri were in uniform and armed, but there is no indication that they touched their firearms or in any way indicated an intention to use them.  Once the federal agents arrived, they took the lead, and from then on the police officers' role was passive. The federal agents were armed and carried handcuffs, but this equipment remained hidden under their garments until the interview was complete.  It is possible that Officer Palmeri's presence in the conference room during the interview could have been construed as a show of force to dissuade Defendant from leaving, but it is not clear where he was seated in relation to Defendant.  The only time during the investigation that Defendant was touched was when Agent Martin conducted a pat down after Defendant acquiesced to the agent's request to do so.

The entire encounter occurred at the Hilton Rialto Hotel, where Defendant had been residing for almost two months.  The hotel was Defendant's temporary home, and he was familiar with the location.  This location was likely the least intimidating location available—certainly less intimidating than an interrogation room at a police station.  The length of the encounter is in question—it is described as lasting between one-and-a-half and two-and-a-half hours.  In any event, the questioning was not so long that it would have disabused a reasonable innocent person of the belief that he or she was free to leave.  The investigators did not tell Defendant that he could get something to eat or drink if he wished, nor did they offer him use of the hotel bathroom.  On the other hand, Defendant never requested these things, and the overall tone of the encounter is consistent with the investigators' testimony that they would have been provided to Defendant upon request.

Comments made by law enforcement officers as to whether a suspect is free to leave or not are often helpful in determining whether the suspect is in custody for Miranda purposes. Brown, 441 F.3d at 1348. The absence of such comments is not, however, determinative. In this case, no comments were made by the investigators one way or the other, and Defendant did not inquire.

IV.

The objective test for determining custody is, by definition, imprecise. The test prevents the finder of fact from taking into account how a particular suspect views his situation when confronted by law enforcement officers. The test is designed to give no weight to perspective colored by individual experiences or cultural differences of the suspect. Nor does it take into account how views of authority change generationally. It is likely that these factors influence the subjective views of suspects when confronted by authority figures, but the question of whether one is in custody is not to be viewed from the perspective of the individual suspect.

In this case, Defendant's freedom of movement was not restrained actually or constructively. The law enforcement officers—state and federal—were exceptionally polite and professional in dealing with Defendant. The record includes no evidence that these officers exercised their authority in an unnecessarily forceful manner. In fact, because Defendant was at all times compliant and the officers were meticulously professional, there were no overt displays of force during the encounter. The oral exchanges between the law enforcement officers and Defendant were not threatening or intimidating. At the beginning of each phase of the investigation, the officer involved asked Defendant if he was willing to participate. The entire encounter was remarkable because of the cooperation between

state and federal officers and because of the dignity with which the officers treated Defendant.

Taking all the circumstances into account, I find Defendant was not in custody when he responded to questions asked by Agents Acosta and Slone.  Defendant's Motion to Suppress (Doc. 29) is therefore **DENIED** in all respects.

**DONE** and **ORDERED** in Orlando, Florida on March April 1st, 2016.

JOHN ANTOON II
United States District Judge

Copies furnished to:
United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Hamid Mohamed Ahmed Ali Rehaif