### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                             **CASE NO: 6:16-cr-3-Orl-28GJK**

**HAMID MOHAMED AHMED ALI REHAIF**

---

### ORDER

A jury found Defendant Hamid Rehaif guilty of one count of possessing a firearm while being an alien illegally in the United States and one count of possessing ammunition while being an alien illegally in the United States.[1] Consistent with controlling law at the time, the Court did not instruct the jury that the Government was required to prove that Rehaif knew of his illegal status when he possessed the firearms and ammunition. The Eleventh Circuit Court of Appeals affirmed. (Doc. 124). But the United States Supreme Court reversed, holding that the Government was indeed required to prove that Rehaif knew of his illegal status. *Rehaif v. United States*, 139 S. Ct. 2191 (2019).

The Supreme Court remanded the case to the Eleventh Circuit, which in turn remanded to this Court with directions to determine whether failure to properly instruct the jury on the Government's burden constituted harmless error. (Doc. 126). Having reviewed the record, the Court finds that the error was not harmless because there is reasonable doubt about whether the error contributed to the guilty verdicts. Thus, Rehaif's convictions

---

[1] 18 U.S.C. § 922(g)(5)(A):  "It shall be unlawful for any person . . . who, being an alien[,] . . . is illegally or unlawfully in the United States, . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

must be vacated.

## I.    Facts

Rehaif, a citizen of the United Arab Emirates, applied to become a student at Florida Institute of Technology (Florida Tech) in Melbourne, Florida.  Florida Tech accepted Rehaif and issued him an I-20 immigration form requiring that he complete his studies by May 31, 2017.  (Trial Tr. Vol. I, Doc. 108, at 187:7–11, 189:15–17, 190:4–5, 228:3–5, 230:6–8).  The United States then issued Rehaif an F-1 student visa allowing him to enter the country to study at Florida Tech.  (*Id.* at 211:6–9).  The visa stated that it would expire on July 22, 2017.  (Trial Ex. 3B, Doc. 73-6).

Rehaif missed the August 12, 2013 Florida Tech fall orientation where incoming foreign students received immigration information, but he checked in with the school on August 20, 2013.  (Doc. 108 at 189:20–23, 206:13–15).  Unfortunately, Rehaif did not do well academically, and on December 17, 2014, Florida Tech dismissed him as a student. (*Id.* at 191:24, 226:13–15).  He did not appeal the dismissal or attempt to enroll for the next term.  (*Id.* at 191:25–192:3, 221:12–17).

Jackie Lingner, one of Florida Tech's designated school officials for international students, sent an email message to Rehaif and his sponsor on January 21, 2015, advising Rehaif that he had been academically dismissed from Florida Tech.  (Trial Ex. 4A, Doc. 73-7; *see also* Doc. 108 at 192:7–15).  She also explained in the email that Rehaif's immigration status would be terminated on February 5, 2015, if he did not transfer to another school.  (Doc. 73-7).  Lingner did not hear from Rehaif after she sent the email messages, and she made no effort to contact him or notify his parents.  (Doc. 108 at 218:14–17, 233:20–23).  Lingner did not receive a read receipt showing that Rehaif had received the email.  (*Id.* at 233:17–19).  Rehaif did not transfer to another school.  (*Id.* at

221:20–25).

On February 23, 2015, Lingner notified the Student and Exchange Visitor Information System (SEVIS) maintained by the Department of Homeland Security that Rehaif's student status had been terminated. (*Id.* at 191:6–7, 199:25–200:1, 223:23–224:4, 224:24–25). Lingner took this action because Rehaif failed "to maintain status due to his dismissal." (*Id.* at 191:19–21, 192:2–3, 222:5–6). Information entered in SEVIS is then sent to other agencies, including Immigration Customs Enforcement ("ICE"). (*Id.* at 241:1–23). It was Lingner's understanding that ICE would then dispatch agents to make sure the terminated student leaves the country. (*Id.* at 241:23–25).

However, after his termination, Rehaif remained in Melbourne, and at some point he began residing at the Hilton Hotel near the Melbourne Airport. While residing at the Hilton, Rehaif frequently checked out of the hotel and then immediately checked back in. As a Hilton Rewards and Diamond Club member, this practice resulted in Rehaif receiving a better room rate. (Trial Tr. Vol. II, Doc. 109, 19:13–20:5). While a guest at the Hilton, Rehaif also frequented a local shooting range where he engaged in target practice. Rehaif was open about his shooting hobby. As a friendly gesture, he handed out rounds of ammunition to members of the Hilton staff. (*Id.* at 15:22–16:1, 24:7–19). These acts are part of what led to the Government's investigation and prosecution of Rehaif. (*Id.* at 97:13–17).

On December 8, 2015, after receiving reports of Rehaif's behavior, law enforcement officials arrived at the Hilton to investigate. (*Id.* at 102:3–6). When the officials approached Rehaif, he voluntarily spoke with them and agreed to be interviewed by FBI Agent Thomas Slone. (*Id.* at 100:19–21). During the interview, Rehaif readily admitted that he had

possessed firearms and ammunition. (*Id.* at 100:7–14, 22–25). He also admitted that he was "out of status." (*Id.* at 101:8–12). At one point, he falsely stated that after leaving Florida Tech, he had transferred to a local for-profit college. (*Id.* at 99:15–20). But he eventually corrected that statement, admitting to Slone that he had not transferred to another school. (*Id.* at 99:21–23).

A grand jury later returned an indictment charging Rehaif with two counts of violating 18 U.S.C. § 922(g)(5)(A). (Doc. 13). His planned defense to the charges was a vague assertion that his visa remained valid after his February 2015 termination from Florida Tech and that even if the visa was not valid, he did not know that he was illegally or unlawfully in the United States. At no time did Rehaif deny that he possessed the firearm and ammunition.

As explained below, the Court, by its rulings, prevented defense counsel from eliciting evidence regarding Rehaif's lack of knowledge. And before the jury began its deliberations, the Court instructed the jury—as it turns out, erroneously—that the Government was "*not* required to prove that [Rehaif] knew that he was illegally or unlawfully in the United States." (Jury Instructions, Doc. 69, at 16 (emphasis added); *see also* Doc. 109 at 170:23–25). Even though Rehaif did not contest evidence that he possessed the firearm and ammunition, the jury deliberated six hours before returning guilty verdicts.

## II.   Law

In *Neder v. United States,* 527 U.S. 1 (1999), the Supreme Court held that failure to instruct the jury on an essential element of a charged offense is subject to a harmless-error analysis. 527 U.S. at 15. If, after applying that analysis, the court is convinced that the error was harmless, the conviction must be affirmed. *Id.* at 15–16. For the court to reach that conclusion, however, the Government must establish beyond a reasonable doubt that

the error did not contribute to the guilty verdict. *United States v. Margarita Garcia*, 906 F.3d 1255, 1267, 1274–75 (11th Cir. 2018). In other words, to find the error harmless, the court must be convinced "that the jury verdict would have been the same absent the error." *Neder,* 527 U.S. at 17.

On the other hand, if the "court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless." *Id.* at 19. This does not, however, mean that a defendant's contesting the issue at trial eliminates the possibility that the error was harmless. *See United States v. Neder*, 197 F.3d 1122, 1129 n.6 (11th Cir. 1999) (explaining that the Supreme Court's "statement means only that the fact [that the omitted element] was not contested supports the conclusion that the jury's verdict would have been the same absent the error").

III.   **Analysis**

This Court's harmless error analysis begins with recognition that the facts in this case are dissimilar to those in *Neder*. In *Neder*, the defendant was charged with multiple counts of tax, bank, wire, and mail fraud. The district judge failed to instruct the jury on the Government's burden of proving that the defendant's misrepresentations were material. But at trial, the defendant did not challenge the materiality of his misrepresentations leading to the fraud charges, and he did not base his defense on the Government's failure to prove that element. Under those circumstances, the Supreme Court found that the failure to instruct was harmless error on the tax counts because "no jury could reasonably find that [the defendant's] failure to report substantial amounts of income on his tax returns was not 'a material matter.'" *Neder,* 527 U.S. at 16. And on remand, the Eleventh Circuit found

that on the bank, mail, and wire fraud counts, the defendant's misrepresentations were overwhelmingly material and that a rational jury could not have concluded otherwise. 197 F.3d at 1129, 1131–34.

By contrast, from the beginning of this case defense counsel insisted that Rehaif's knowledge of his illegal status was an element of the charged offenses—an element he contended the Government could not prove. And he unrelentingly maintained that position throughout the proceedings. It was his defense. Furthermore, the evidence of Rehaif's knowledge of his illegal status—while significant—was not overwhelming. This is true even though he was prohibited from presenting evidence to the contrary. Thus, the Government's argument for application of the harmless error rule was far stronger in *Neder* than it is here.

Turning to the relevant aspects of the analysis in this case, Rehaif first addressed the scienter issue in responding to the Government's pretrial Motion in Limine (Doc. 47). In its motion, the Government sought to prevent Rehaif from presenting evidence showing his lack of knowledge. Relying on case law from the Eleventh Circuit, the Government argued that it was "not required to prove that [Rehaif] had knowledge of the illegality of his actions in so far as it pertains to his immigration status." (*Id.* at 20). The Government's position was that because § 922(g) was a strict liability crime, it did not "have to prove that [Rehaif] knew he was a member of a prohibited [category] of persons, in this case illegal aliens who could not possess firearms and ammunition." (*Id.* at 22).

Rehaif responded, arguing that he should be allowed to show that he had applied for and received a Florida hunting license prior to his arrest. (Doc. 51 at 14–15). Rehaif contended that this was relevant to his § 922(g)(5)(A) charges because it was evidence of

his state of mind regarding his immigration status. (*Id.*). He sought to argue that if the State of Florida believed he was here legally, why should he believe otherwise? Rehaif further pointed out that there was no authority on whether subparagraph (5)(A) specifically included a requirement to show that he was "knowingly in the United States 'illegally and unlawfully.'" (*Id.* at 14).

The Court granted the Government's motion in limine. (Doc. 63). In doing so, the Court observed that under controlling authority, a conviction under "§ 922(g)(5)(A) does not require specific intent—that is, the Government does not need to prove that Rehaif knew it was illegal to possess a firearm." (*Id.* at 3). By this ruling, the Court foreclosed Rehaif's planned defense—that he was unaware that his status as an alien admitted into the United States on a F-1 student visa had changed, making his presence in the United States illegal.[2]

Although the Court granted the Government's motion in limine, the parties continued to raise the issue of Rehaif's knowledge of his immigration status during the trial. In the Government's opening statement, the prosecutor advised the jury that there were only two things the Government had to prove: 1) "[Rehaif] was present illegally in the United States"; and 2) "while he was present illegally in the United States, he knowingly possessed firearms and ammunition." (Doc. 108 at 168:1–6). And before Rehaif's opening statement, the Government moved to prohibit defense counsel from mentioning the driver's license that Florida's Department of Motor Vehicles ("DMV") had issued to Rehaif. (*Id.* at 154:24–158:1, 172:6–174:18).

---

[2] And during the trial, the Court noted that "[i]f it were a specific intent crime requiring [Rehaif] to know . . . his immigration status, then the ruling would be otherwise." (Doc. 109 at 130:5–7).

Knowing that the Court had ruled that Rehaif's knowledge of his immigration status was irrelevant, defense counsel asserted that he wanted to reference the driver's license for another reason. Defense counsel explained that the DMV required Rehaif to submit his immigration forms—including his passport, visa, and I-20 form—before it would issue the license. (*Id.* at 155:24–156:2). This information, counsel argued, would impeach Lingner's testimony regarding Rehaif's immigration status. But the DMV's acceptance of Rehaif's passport and immigration documents could have also buttressed his argument that he believed he was legally in the United States. As the Government emphasized, Rehaif obtained the license before his immigration status changed. Nonetheless, defense counsel contended that the DMV's failure to revoke the license when his immigration status changed bolstered his belief that he was here legally. This was especially the case when the DMV took no action after a police officer issued Rehaif a citation for a traffic violation. (Doc. 109 at 128:8–18).

The Court shared the Government's concern that evidence of the driver's license would likely confuse the jury regarding the relevance of Rehaif's understanding of his immigration status. (Doc. 108 at 172:13–18). To guard against this possible confusion, the Court cautioned defense counsel. The Court explained that if such confusion arose, the Court would consider giving a curative instruction that the Government was not required to prove that Rehaif knew he was illegally present in the United States. (*Id.* at 173:1–2, 174:7–10).

Rehaif's knowledge of his immigration status was also a focus of Lingner's testimony. Lingner explained Florida Tech's process for accepting and monitoring foreign students as well as for corresponding with the Department of Homeland Security regarding

foreign students' standing with the school.   She also testified that she sent Rehaif information about his student status.   On remand, the Government argues that there was overwhelming evidence that Rehaif knew of his illegal immigration status.   There is irony in this argument because at trial, the Government questioned Lingner regarding the steps she took to advise Rehaif of his termination—to let him know that he was no longer a Florida Tech student and that his immigration status had changed.   (*Id.* at 192:7–15, 194:7–11, 218:6–219:13, 222:1–4).   And on cross-examination, Lingner admitted that immigration regulations are often confusing to foreign students.   (*Id.* at 228:6–8).   Yet the Government objected to—and the Court excluded—evidence Rehaif wished to present regarding his lack of knowledge.

A similar problem existed with Slone's testimony regarding Rehaif's alleged statement that he was "out of status."   This testimony was ostensibly offered to show Rehaif's knowledge that he was in the country illegally.   But the Government again objected to—and the Court again prohibited—other testimony bearing on Rehaif's understanding of his immigration status.   The irony is extreme here, as the Government now offers Rehaif's statement to Slone in support of the argument that the error was harmless.   Rehaif's counsel was also handicapped in cross-examination of Slone.   Counsel could have raised issues concerning Rehaif's understanding of the English language and immigration regulations, exactly what questions were asked and what answers were given, and why the investigator did not follow up with questions about what Rehaif meant by "out of status."

But for the Court's rulings, Rehaif could have argued that his conduct from the time he left school through his arrest showed that he did not believe his presence in the United States was illegal.   As defense counsel points out, Rehaif lived openly in Melbourne.   He

made no effort to hide his identity or his shooting hobby, and he freely let acquaintances know that he visited a shooting range.  He applied for and received driver's and hunting licenses, resided in a hotel environment, and when approached regarding his conduct, readily spoke with investigators.  And except for his false statement that he was attending another school, he was forthcoming and polite.

The final step in this harmless error analysis is to consider the instruction the court gave at the end of the trial regarding the Government's burden—an instruction totally at odds with the Supreme Court's holding in this case.  The Court instructed the jury that the Government was "*not* required to prove that [Rehaif] knew that he was illegally or unlawfully in the United States." (Doc. 69 at 16 (emphasis added); *see also* Doc. 109 at 170:23–25). Thus, even if the jury had gleaned doubts regarding what Rehaif believed about the legality of his presence in the United States, the jury was instructed that those doubts had no bearing on whether the Government had proved its case.

These events form the context in which the Court failed to instruct the jury that the Government had a burden to prove that Rehaif knew he was illegally in the United States. Obviously, the failure was not a mere oversight by counsel or the Court.   Rehaif's understanding of his immigration status was an issue raised by defense counsel at the start of the case and argued throughout.  Because of the errors, Rehaif was unable to present his defense.

## IV.    Conclusion

The record establishes that the error of failing to instruct the jury that the Government was required to prove that Rehaif knew he was illegally present in the United States was not harmless.  The severity of that error was compounded by the instruction that the Government did *not* have that burden.   Also aggravating the problem were the

Court's evidentiary rulings that prohibited Rehaif from presenting evidence of his lack of knowledge.   The result was that Rehaif was not allowed to have the jury consider his defense, which we now know was viable.

Had the Court had the benefit of the Supreme Court's opinion in this case, the jury would have received evidence supporting Rehaif's lack-of-knowledge defense along with a proper instruction on the Government's burden.   As it was, the jury was called upon to make a decision without the benefit of hearing Rehaif's defense.[3]   In the end, the Court is not convinced that the jury verdict would have been the same absent the error.   Thus, the error was not harmless.

Accordingly, Rehaif's convictions are hereby **VACATED**.

**DONE** and **ORDERED** in Orlando, Florida, on April 17th, 2020.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
United States Attorney
United States Probation Office
Counsel for Defendant

---

[3] This, in effect, was to demand the jury to violate the ancient rule that "[i]n case of dissension, never dare to judge till you've heard the other side."   Euripides, *Children of Herakles*.